**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

DR. AMEET VOHRA; VOHRA WOUND
PHYSICIANS MANAGEMENT, LLC; VHS
HOLDINGS, P.A.; VOHRA WOUND
PHYSICIANS OF IL, S.C.; VOHRA POST
ACUTE CARE PHYSICIANS OF THE EAST,
P.A.; VOHRA WOUND PHYSICIANS OF
MID-WEST, S.C.; FLORIDA POST ACUTE
CARE CLINICIANS, LLC; VOHRA POST
ACUTE CARE PHYSICIANS OF TEXAS,
PLLC; VOHRA WOUND PHYSICIANS OF
THE WEST, P.C.; VOHRA WOUND
PHYSICIANS OF CA, P.C.; VOHRA WOUND
PHYSICIANS OF NY, PLLC; VOHRA POST
ACUTE CARE PHYSICIANS OF THE
NORTHEAST, P.A.; and VOHRA WOUND
PHYSICIANS OF FL, LLC,

No. 1:25-cv-23030

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HEALTH & HUMAN SERVICES; CENTERS
FOR MEDICARE AND MEDICAID
SERVICES; ROBERT F. KENNEDY, JR., in
his official capacity as Secretary of Health and
Human Services; MEHMET C. OZ, M.D., in his
official capacity as Administrator for the Centers
for Medicare & Medicaid Services,

Defendants.

**COMPLAINT**

Plaintiffs Dr. Ameet Vohra (Dr. Vohra); Vohra Wound Physicians Management, LLC

(Vohra WPM); VHS Holdings, P.A. (VHS Holdings); Vohra Wound Physicians of IL, S.C.; Vohra

Post Acute Care Physicians of the East, P.A.; Vohra Wound Physicians of Mid-West, S.C.; Florida

Post Acute Care Clinicians, LLC; Vohra Post Acute Care Physicians of Texas, PLLC; Vohra

1

Wound Physicians of the West, P.C.; Vohra Wound Physicians of CA, P.C.; Vohra Wound Physicians of NY, PLLC; Vohra Post Acute Care Physicians of the Northeast, P.A.; and Vohra Wound Physicians of FL, LLC (collectively, Plaintiffs or Vohra) bring this complaint against Defendants the United States Department of Health and Human Services (HHS); the Centers for Medicare and Medicaid Services (CMS); the Secretary of HHS; and the Administrator for CMS; and allege as follows:

## NATURE OF THE ACTION

1.      Vohra WPM, together with its associated practice entities,[1] (collectively, the Vohra Entities or Vohra Wound Physicians) operate one of the largest and most successful specialty wound care practices in the United States and seek injunctive relief to maintain the status quo and ensure that hundreds of thousands of nursing home patients across the country continue to have access to its life-saving care. Without immediate relief from the Court, Vohra Wound Physicians will face almost certain failure from the government's improper retaliation against Vohra for exercising its constitutional rights, endangering the well-being of elderly patients at the thousands of nursing facilities that Vohra Wound Physicians serves.

2.      Proper wound care is critical to the promotion of healing, infection prevention, and minimizing the risk of complication associated with chronic wounds. Wound care is especially important to older adults—who generally experience a greater incidence of chronic wounds, longer healing times, and heightened risk for serious complications—and to patients in nursing facilities in particular. Dr. Vohra founded Vohra Wound Physicians more than two decades ago to address

---

[1]      Vohra Wound Physicians of IL, S.C.; Vohra Post Acute Care Physicians of the East, P.A.; Vohra Wound Physicians of Mid-West, S.C.; Florida Post Acute Care Clinicians, LLC; Vohra Post Acute Care Physicians of Texas, PLLC; Vohra Wound Physicians of the West, P.C.; Vohra Wound Physicians of CA, P.C.; Vohra Wound Physicians of NY, PLLC; Vohra Post Acute Care Physicians of the Northeast, P.A.; and Vohra Wound Physicians of FL, LLC.

the unmet need for early wound care intervention for older adults residing in nursing facilities.[2] Vohra Wound Physicians has since become one of the nation's leading providers of wound care. Until recently, Vohra Wound Physicians conducted 1.4 million patient visits per year and served over three thousand skilled nursing facilities.

3.      The federal government, however, has jeopardized the health of Vohra Wound Physicians' patients by suspending Vohra's Medicare payments. This extraordinary act— essentially, the death penalty for a health care provider—is egregiously unlawful. Vohra respectfully requests that the Court set it aside and enjoin this unlawful act.

4.      To be sure, CMS *can* suspend Medicare payments in appropriate cases. But such actions come, if at all, when government investigators initially discover credible allegations of fraud—not after a five-year investigation, and during the pendency of a recent False Claims Act lawsuit.

5.      Here, by contrast, the timing of the CMS suspension admits only one explanation— the suspension is clear retaliation because Vohra exercised its First and Fifth Amendment rights to challenge the False Claims Act (FCA) lawsuit the government filed against it. CMS first suspended those payments on Tuesday, May 20, 2025, a mere two business days after Vohra exercised its First and Fifth Amendment rights to challenge the FCA action by filing a motion to dismiss on the prior Friday, May 16, 2025. The government has known of and investigated the allegations described in the FCA action for *years* before that and had not suspended Vohra's Medicare payments.

---

[2]   Vohra WPM was formed in 2010 but was preceded by Vohra Health Services, P.A., the original entity founded in 2000 to deliver these services. The individual affiliated practice entities were formed over the years as Vohra Wound Physicians expanded its geographical reach.

6.      As this highly unusual timing demonstrates, the government's suspension decision could not have been based on the discovery of new evidence indicating that Vohra committed fraud. Instead, the only reasonable inference is that the suspension decision was motivated by retaliation against Vohra for exercising its constitutionally protected right to defend itself in the FCA lawsuit and to improperly strong-arm Vohra into settling that action. That is transparent retaliation—and it is unlawful.

7.      CMS's unconstitutional suspension wreaks havoc on Vohra Wound Physicians, a company devoted to treating vulnerable nursing home patients that receives approximately 75% of its income from Medicare payments. The government's unconstitutional actions threaten not only Vohra Wound Physicians' ongoing ability to operate, but they also impose significant harm on the poor and elderly patients that Vohra Wound Physicians primarily serves. Vohra Wound Physicians' inability to provide services will leave the vast majority of its patients without access to any alternative wound-care physicians within their nursing homes.

8.      Injunctive relief exists for just such circumstances: The government's unconstitutional action must be enjoined to protect the hundreds of thousands of patients who rely on Vohra Wound Physicians' services. It is necessary to keep Vohra Wound Physicians as an ongoing entity. And the government can claim no harm: If it ultimately succeeds in proving some subset of claims are improper, it can recoup whatever amounts it proves appropriate. But the government should not be permitted to use the well-being of hundreds of thousands of in-need patients to retaliate against Vohra and as leverage to force Vohra to settle the claims asserted against it on unreasonable terms.

**PARTIES**

9.      Dr. Vohra is the founder and Executive Chairman of Vohra WPM and is a resident of Miami-Dade County, Florida.

10.     Vohra WPM is a Delaware limited liability company with its principal place of business in Miramar, Florida.

11.     VHS Holdings is a Florida S-corporation with its principal place of business in Miramar, Florida. VHS Holdings is the majority owner of Vohra WPM.

12.     Vohra Wound Physicians of IL, S.C., is an Illinois service corporation, with physicians practicing in Illinois.

13.     Vohra Post Acute Care Physicians of the East, P.A., is a New Jersey professional association, with physicians practicing in New Jersey, Delaware, Washington, D.C., Maryland, Minnesota, South Carolina, Tennessee, Kentucky, and Connecticut.

14.     Vohra Wound Physicians of Mid-West, S.C., is a Wisconsin service corporation, with physicians practicing in Wisconsin.

15.     Florida Post Acute Care Clinicians, LLC, is a Florida limited liability company, with physicians practicing in Florida.

16.     Vohra Post Acute Care Physicians of Texas, PLLC, is a Texas professional limited liability company, with physicians practicing in Texas.

17.     Vohra Wound Physicians of the West, P.C., is a Colorado professional corporation, with physicians practicing in Colorado, Indiana, and Iowa.

18.     Vohra Wound Physicians of CA, P.C., is a California professional corporation, with physicians practicing in California.

19.     Vohra Wound Physicians of NY, PLLC, is a New York professional limited liability company, with physicians practicing in New York and North Carolina.

20.     Vohra Post Acute Care Physicians of the Northeast, P.A., is a Florida professional association, with physicians practicing in Florida, Massachusetts, Pennsylvania, and West Virginia.

21.     Vohra Wound Physicians of FL, LLC, is a Florida limited liability company, with physicians practicing in Florida, Alabama, Georgia, Missouri, Ohio, Oklahoma, Rhode Island, and Virginia.

22.     Defendant the United States Department of Health and Human Services is the federal agency overseeing the administration of the Medicare Act.

23.     Defendant the Centers for Medicare & Medicaid Services is the federal agency tasked with administering the Medicare Act.

24.     Defendant Robert F. Kennedy, Jr., is sued in his official capacity only as Secretary of Health and Human Services. The Secretary of Health and Human Services is the official charged by law with administering the Medicare Act. The Secretary is the official against whom a Medicare Act claim is to be brought. *See* 42 U.S.C. §§ 405(g), 1395ii.

25.     Defendant Mehmet C. Oz is sued in his official capacity only as Administrator for the Centers for Medicare and Medicaid Services. The Administrator of CMS implements the Medicare program.

**JURISDICTION AND VENUE**

26.     This Court has jurisdiction under 42 U.S.C. §§ 1395cc(h); 405(g), 1395ii; 5 U.S.C. § 702; and 28 U.S.C. § 1331 (federal question). Additionally, Vohra requests declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202.

27.     Venue lies in this judicial district pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

28.     Vohra has met the administrative exhaustion requirements in 42 U.S.C. § 405(g) and can lawfully appear before this court.

## FACTUAL ALLEGATIONS

**A.     The Medicare Program.**

29.     The Medicare program provides federally funded health insurance to over 64 million elderly or disabled Americans. *Becerra v. Empire Health Found.*, 597 U.S. 424, 428 (2022); *see* 42 U.S.C. § 1395 *et seq*. It does so by reimbursing medical providers and suppliers for services they render to eligible patients. *See Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011). CMS, as an operating division of the Department of Health and Human Services, administers the Medicare program.

30.     The Medicare program is made up of four parts—Parts A, B, C, and D. 42 U.S.C. §§ 1395c-1395w-154. Relevant here is Medicare Part B, which establishes "a voluntary insurance program to provide medical insurance benefits . . . for aged and disabled individuals who elect to enroll under such program, to be financed from premium payments by enrollees together with contributions from funds appropriated by the Federal Government." 42 U.S.C. § 1395j. Medicare Part C permits eligible individuals to elect to receive health insurance coverage through private plans managed by Medicare Advantage Organizations, *see* 42 U.S.C. § 1395w-21 *et seq.*

31.     To receive reimbursement on claims for services rendered under the Medicare program, healthcare providers must enroll as a Medicare supplier or provider and abide by certain requirements. 42 C.F.R. §§ 424.505; 424.510. Once enrolled, the provider or supplier receives billing privileges and a valid billing number. 42 C.F.R. § 424.505.

32.     CMS may suspend Medicare payments to enrolled providers and suppliers "[i]n cases of suspected fraud … if CMS … has consulted with the [HHS Office of Inspector General], and, as appropriate, the Department of Justice, and determined that a credible allegation of fraud

7

exists against a provider or supplier, unless there is good cause not to suspend payments." 42 C.F.R. § 405.371(a)(2);.*see also* 42 U.S.C. § 1395y(o) ("The Secretary may suspend payments to a provider of services or supplier under this subchapter pending an investigation of a credible allegation of fraud against the provider of services or supplier, unless the Secretary determines there is good cause not to suspend such payments.").

33.     The payment suspension provisions are intended to provide CMS with "the ability to act as soon as a problem is detected, preventing money from being paid while balancing the rights and needs of providers, suppliers, and beneficiaries." Medicare, Medicaid, and Children's Health Insurance Programs; Additional Screening Requirements, Application Fees, Temporary Enrollment Moratoria, Payment Suspensions and Compliance Plans for Providers and Suppliers, 76 Fed. Reg. 5862-01, 5893 (Feb. 2, 2011).

34.     When CMS enacts a payment suspension based on credible allegations of suspected fraud, the suspension continues for 180 days and can be renewed periodically for up to 18 months (or more, in certain circumstances). 42 C.F.R. § 405.371(b)(3). The suspension also terminates when any "legal action is terminated by settlement, judgment, or dismissal, or when the case is closed or dropped because of insufficient evidence to support the allegations of fraud." 42 C.F.R. §§ 405.370; 405.372(d)(3).

35.     Providers and suppliers have the opportunity to submit a rebuttal statement following the payment suspension. 42 C.F.R. § 405.374. CMS must then consider the rebuttal statement and determine whether the facts justify the termination of the suspension. 42 C.F.R. § 405.375.

**B.     Vohra Wound Physicians' wound care services.**

36.     Proper wound care is critical to the promotion of healing, infection prevention, and minimizing the risk of complication associated with chronic wounds. *See generally* George Han

& Roger Ceilley, *Chronic Wound Healing: A Review of Current Management and Treatments*, Advances in Therapy, Jan. 2017, at 599-610. Wound care involves a range of interventions, including cleaning and irrigating a wound; debridement, which involves removing necrotic (dead) tissue from the wound; and applying dressings to the wound. *Id.* Some wounds require the use of particularly invasive methods, such as the surgical debridement of necrotic tissue, that must be performed by specialized wound care physicians. *Id.* at 603. Untreated, necrotic tissue frequently becomes infected, resulting in delayed healing as well as heightened risk for serious complications like sepsis or gangrene. *Id.*; *see generally* M. Peetermans et al., *Necrotizing Skin and Soft-Tissue Infections in the Intensive Care Unit*, Clinical Microbiology and Infection, Jan. 2020, at 8-17.

37.    Older adults generally experience a greater incidence of chronic wounds, longer healing times, and heightened risk for serious complications from inadequate wound care. *See* Lisa Gould et al., *Chronic Wound Repair and Healing in Older Adults: Current Status and Future Research*, Wound Repair and Regeneration, Feb. 2015, at 2-4. This is partially due to the fact that certain medical conditions that disproportionately affect older adults, such as vascular diseases or diabetes, are also associated with an increased propensity to develop chronic wounds. *Id.* at 2. Without adequate wound care, older adults are particularly at risk of experiencing wound-related infection, and associated chronic pain, mobility issues, hospitalization, and even amputation of the affected area in severe cases.

38.    Recognizing this critical and unmet need, Dr. Ameet Vohra founded the practice that ultimately became Vohra Wound Physicians in 2000 to provide specialized wound care services within nursing facilities.[3]

---

[3]    *See supra* note 2 (describing the predecessor entity to Vohra WPM and the formation of Vohra WPM and the affiliated practice entities over time).

39.     Vohra Wound Physicians contracts with nursing facilities—including long-term acute care hospitals, skilled nursing facilities, and assisted living facilities—to make wound care specialists available to their patients. These specialists evaluate patients' wounds identified by nursing staff, advise facility staff on proper wound care management, and, when appropriate, provide direct services to patients, including wound debridement. By providing bedside specialized wound care services, like debridement, vulnerable elderly patients avoid receiving these services at a clinic or hospital—contexts ripe with heightened infection risk and other transportation-related harms.

40.     Over time, Vohra Wound Physicians has grown its wound care practice into a large-scale operation, with geographical reach spanning most of the United States. The Vohra Entities' physicians engage in approximately 1.4 million patients visits every year and provide services to approximately 200,000 unique patients. According to clinical research, patients treated by the Vohra Entities' wound physicians experience significantly faster healing time than other patients and a significantly lower probability of hospitalization in connection with their wound. Joan E. DaVanzo et al., *A Retrospective Comparison of Clinical Outcomes and Medicare Expenditures in Skilled Nursing Facility Residents with Chronic Wounds*, Ostomy Wound Management, Sep. 2010, at 39.

41.     As a provider that primarily treats elderly patients in nursing homes, Medicare reimbursements represent 75% of Vohra Wound Physicians' revenue. Because of the improved outcomes experienced by patients treated by the Vohra Entities' wound physicians, one study estimated that Vohra Wound Physicians provides an average savings to Medicare of approximately $19,000 per patient. *Id.* at 40.

**C.      The Department of Justice's investigation into Vohra.**

42.      Since at least 2020, Vohra has been subject to a DOJ investigation into coding and billing practices for Medicare claims for debridement services and associated evaluation and management services.[4]

43.      In particular, on March 13, 2020, Vohra received Civil Investigative Demands (CIDs) from DOJ requesting documents in connection with a False Claims Act (FCA) investigation. Over the ensuing five years, Vohra produced documents, answered interrogatories, and made a series of presentations to DOJ in response to those and subsequently issued CIDs.

44.      Over time, Vohra and DOJ engaged in discussions to resolve the government's potential FCA claims. However, those settlement discussions were unsuccessful.

45.      Ultimately, on April 4, 2025, DOJ filed a civil action against Vohra WPM, its majority owner (VHS Holdings), and its founder and executive chairman, Dr. Vohra (collectively the Vohra defendants). *See* Complaint, *United States v. Vohra*, No. 25-cv-21570 (S.D. Fla. Apr. 4, 2025), ECF No. 1 (the FCA lawsuit).  The FCA lawsuit brings claims under the FCA and for unjust enrichment on behalf of HHS and CMS in connection with Vohra WPM's submission of debridement and evaluation and management claims to Medicare. *See id.*

**D.      CMS's Medicare payment suspension.**

46.      After the filing of the FCA lawsuit, the parties continued engaging in settlement discussions. However, the Vohra defendants declined to accept the government's unreasonable

---

[4] Vohra had even earlier contacts with HHS and its contractors in connection with its provision of wound care services, receiving a subpoena for medical records from the HHS Office of Inspector General in 2018 and having been subject to an investigation by a Zone Program Integrity Contractor to CMS in 2016.

demands and instead moved to dismiss the FCA lawsuit on Friday, May 16, 2025. *See* Mot. to Dismiss, *Vohra*, No. 25-cv-21570 (S.D. Fla. filed May 16, 2025), ECF No. 15.

47.     Almost immediately thereafter—by the following Tuesday, May 20, 2025—CMS suspended 100% of Medicare payments to Vohra Wound Physicians. Vohra received notice of the suspension on May 23, 2025, in letters stating that "the Centers for Medicare & Medicaid Services (CMS), after consulting with the Department of Health and Human Services Office of the Inspector General, has decided to fully suspend Medicare payments to [the relevant practice entity], pursuant to 42 C.F.R. § 405.371(a)(2) and 42 C.F.R. § 405.372(a)(4)(iii)." The letters claimed that the suspensions were based on the supposedly "credible allegations of fraud detailed in the United States complaint against Vohra Wound Physicians Management, LLC, VHS Holdings, P.A., and Dr. Ameet Vohra."

48.     The letters further stated that the suspensions "will last until resolution of the investigation, as defined under 42 C.F.R. § 405.370(a)," which defines the resolution of an investigation as being "when legal action is terminated by settlement, judgment, or dismissal, or when the case is closed or dropped because of insufficient evidence to support the allegations of fraud."

49.     In other words, CMS took the position that, until the FCA litigation is resolved by settlement, judgment, dismissal, or abandonment, Vohra will receive *none* of the Medicare payments that comprise 75% of its revenue. Reaching any of these milestones could take *years*—unless Vohra accedes to the government's settlement demands and relinquishes its constitutionally protected right to defend itself.

50.     On June 12, 2025, Vohra Wound Physicians submitted rebuttal letters to the payment suspension letters to each of their Unified Program Integrity Contractors.

51.     As of the date of filing, Vohra has not received any indication that the payment suspension has been overturned.

**E.      The extraordinary timing of the CMS payment suspensions.**

52.     CMS's decision to suspend Vohra Wound Physicians' Medicare payments *after* the filing of the civil FCA action, rather than much earlier during the government's investigation of fraud allegations against Vohra, is virtually unprecedented.

53.     Bradley Hart, an expert retained by Vohra in this case, is a healthcare program integrity and compliance specialist with a decades-long career in investigating and prosecuting healthcare fraud. He has overseen hundreds of investigations in cases of suspected healthcare fraud at the state and federal level. Between 2019 and 2022, Mr. Hart served as Deputy Center Director for the Center for Program Integrity (CPI) within CMS. In that role, Mr. Hart was responsible for protecting the integrity of trillions of dollars of annual spending by the federal government on Medicare, Medicaid, and Affordable Care Act services.

54.     At any given time during Mr. Hart's four years at CPI, the Center had approximately 650 active payment suspensions in place.

55.     In the hundreds of health care fraud investigations Mr. Hart has overseen, Mr. Hart has *never* seen a "Credible Allegation of Fraud" (CAF) payment suspension issued in a civil matter, post litigation filing. But that is precisely what happened here.

56.     The rare instances in which Mr. Hart is aware of a post-litigation suspension of Medicare payment all occurred in the quite different context of a criminal indictment issuing.

57.     Rather, it is almost universally the case that when CMS suspends Medicare payments, it does so during the investigation and thus *before* the filing of civil litigation. That is because it is during the investigation process that the government ordinarily uncovers novel factual information that will lead it to conclude that payment suspension is necessary. It is extremely

uncommon for CMS to institute a payment suspension when it has not encountered novel investigative information impacting its assessment of the credibility of allegations of fraud by the Department of Justice or the Office of Inspector General for the Department of Health and Human Services.

58.     This timing aligns with the purpose of CMS's Medicare suspension authority, which exists to prevent harm to the public fisc that might arise from permitting the provider or supplier in question to continue receiving payments from the Medicare trust funds. In other words, when the government believes that a provider is committing fraud and there is a need to safeguard public funds, the natural course of action is to suspend payment as soon as the government is aware of information creating a credible suspicion. Indeed, the Affordable Care Act instituted "Credible Allegation of Fraud" (CAF) suspensions to move from a program integrity model focused on recovering overpaid funds to one more focused on preventing misallocations in the first place.

59.     As a result, it is extremely uncommon for CMS to institute a payment suspension *after* the filing of litigation when no new facts have been uncovered.

60.     In Mr. Hart's experience with CAF suspensions, the payment suspensions imposed on Vohra are highly atypical. Mr. Hart is not aware of any customary reason why CMS would impose a suspension on Vohra after Vohra had cooperated in a multi-year investigation, the government had already filed a civil False Claims Act action, and there is no criminal case.

61.     Here, CMS did not institute a payment suspension against Vohra during the course of the government's years-long investigation or even upon the filing of the FCA lawsuit. But, a mere *two business days* after the Vohra defendants rejected the government's settlement demands and filed their motion to dismiss that lawsuit, the government reversed course and decided to suspend payment.

62.     CMS could not possibly have discovered any new investigative information impacting its assessment of the credibility of allegations of fraud against Vohra at that time, particularly given that Vohra did not produce any new information to CMS during that time period. Instead, the only explanation for the timing of CMS's payment suspension was to retaliate against Vohra for exercising its right to defend itself in the FCA action by filing a motion to dismiss and for failing to accede to the DOJ's settlement demands.

**F.     The irreparable harm to Vohra Wound Physicians caused by the payment suspension.**

63.     The unlawful payment suspension has already begun to have an enormous impact on Vohra Wound Physicians' revenue and operations and threatens to put Vohra Wound Physicians entirely out of business within just a matter of months.

64.     Approximately 75% of Vohra Wound Physicians' revenue comes from services provided to Medicare patients. In other words, Vohra Wound Physicians saw the majority of its expected revenue slashed overnight as a result of the payment suspension.

65.     So far, Vohra Wound Physicians' physicians have continued to provide wound care services to their patients, including to Medicare beneficiaries. To date, Vohra Wound Physicians has provided approximately $37 million in services to Medicare patients since the suspension went into effect and has not been paid for those services. Vohra Wound Physicians made the decision to continue conducting its business in order to ensure continuity of care for its vulnerable patients and maintain critical relationships with its nursing facility customers. But Vohra Wound Physicians can only financially support doing so for a limited period of time.

66.     If Vohra Wound Physicians were to stop providing services to Medicare patients, it would quickly lose nursing facility customers. Because Medicare beneficiaries make up a large

majority of the patients at most nursing facilities, nursing facility customers generally would not contract with a specialist who can treat only a minority of their patients.

67.     Prior to the filing of the FCA lawsuit, Vohra Wound Physicians serviced approximately 3,200 nursing facilities and averaged approximately 28,000 patient encounters per week. After the filing of the complaint, those numbers dropped by approximately 10%, with many nursing facilities providing Vohra Wound Physicians notice that they are terminating their contracts with the company because of concerns about how the FCA case will impact their patients' ability to obtain wound care from the Vohra Entities' physicians. If it were to stop providing services to Medicare patients, Vohra Wound Physicians expects a much larger, and irreversible, drop in customers.

68.     The payment suspension will also soon force Vohra Wound Physicians to stop using skin substitutes to treat patients with some of the most chronic wounds. A skin substitute is a group of biological or synthetic materials that can be placed on the skin to enable healing where a patient's wound has repeatedly failed to respond to other treatments. Although this procedure has a remarkable success rate (for over 50% of patients), it is only used sparingly due to the high costs associated with the graft material and the procedure. The Vohra Entities' physicians largely use skin substitutes as a last resort on patients.

69.     Vohra Wound Physicians currently performs approximately 2,000 patient encounters with skin substitutes per month. Unfortunately, as a result of the shrinking of its revenue base, Vohra Wound Physicians will soon not have the cash on hand to purchase the graft material necessary to perform these procedures. This material needs to be purchased from a vendor at significant cost. Although Vohra Wound Physicians has attempted to expand the time in which it must pay the vendor (from 60 to 120 days), Vohra Wound Physicians will not have the funds

available to pay this vendor at the end of the period and therefore the vendor will likely cut off Vohra Wound Physicians' access. Vohra Wound Physicians' leadership is working diligently to identify an alternative supplier but, if the suspension is not lifted immediately, Vohra Wound Physicians anticipates having to stop providing skin substitutes to its patients. This will only exacerbate Vohra Wound Physicians' financial condition and result in the further loss of customers and exodus of its physicians.

70.     These dramatic impacts from the payment suspension severely threaten Vohra Wound Physicians' ability to survive. Indeed, it is only a matter of months until Vohra Wound Physicians will be forced to shut down its operations entirely.

71.     On August 28, 2024, FS Investments lent Vohra Wound Physicians approximately $130 million and the terms of the loan agreement require Vohra Wound Physicians to pay back the loan by August 28, 2025. Although FS Investments previously indicated that Vohra Wound Physicians would have no difficulty obtaining a renewal of the loan (as is the case with most loans of this nature), the lender has now indicated that it will not be renewing its loan if the suspension remains in place. In other words, Vohra Wound Physicians will be expected to repay FS Investments approximately $91 million—which it will certainly be unable to do given its current finances. This will mean the company is in default of its loan obligations and FS Investments will have certain rights to control the company, including by forcing it into bankruptcy.

72.     Moreover, even if its lenders do not force it into bankruptcy, Vohra Wound Physicians anticipates that as a result of the payment suspension it will be unable to make payroll in approximately three to four months. At that point, Vohra Wound Physicians will be forced to cease operating unless it is able to obtain a source of additional funding.

73.     Finally, without immediate relief, it is unlikely that Vohra Wound Physicians could recover its business, even if it managed to financially survive through the termination of the payment suspension. Vohra Wound Physicians relies on an industry-leading team of skilled physicians to provide care. Vohra Wound Physicians expends substantial resources providing comprehensive up-front training in wound care to its physicians. Other employers often try to recruit the Vohra Entities' physicians and will likely use the payment suspension as additional leverage for physician recruiting. Unless the payment suspension is lifted promptly, Vohra Wound Physicians could see its physician ranks decimated, leaving it unable to operate its business as a practical matter. Additionally, nursing facilities typically enter into long-term contracts with wound care providers. Any lost nursing home customer located in an area that is served by another wound care provider that subsequently contracts with that other provider will be difficult, if not impossible, to win back, particularly once patients develop relationships with the other provider's physicians.

**G.      The irreparable harm to the public caused by the payment suspension.**

74.     The payment suspension also threatens to ultimately deprive Vohra Wound Physicians' patients of the ability to obtain access to critical wound care services.

75.     Although there are some competitors to Vohra Wound Physicians in the wound care space, those other wound care companies do not operate nationwide. As a result, the vast majority of Vohra Wound Physicians' current patients will not have access to a wound care physician at all if the company stops operating. Specifically, Vohra Wound Physicians estimates that 90% of the nursing homes across the country will lack an alternative doctor. In fact, as of 2021, the Government Accountability Office recognized that many of the approximately 15,000 skilled nursing facilities nationwide "do not have the resources or staff needed to care for critically ill patients that need expensive or frequent wound care treatments." *See* U.S. Government

Accountability Office, GAO-21-92, Medicare Severe Wound Care: Spending Declines May Reflect Site of Care Changes; Limited Information Is Available on Quality 16 (2021). This problem will only intensify if Vohra Wound Physicians is forced to close its doors because of the government's retaliatory suspension.

76.     Without a wound care physician who can visit nursing home residents on site, those patients will be forced to go to the hospital to obtain the necessary care, placing the health of those patients are greater risk.

77.     Despite advances in science and treatment regimes, wounds still lead to thousands of hospitalizations each year, many of which can be avoided through proper intervention before infections. In 2018, for example, 287,547 Medicare fee-for-service beneficiaries were admitted to inpatient facilities with diagnoses that included severe wounds. *See* U.S. Government Accountability Office, GAO-21-92, Medicare Severe Wound Care: Spending Declines May Reflect Site of Care Changes; Limited Information Is Available on Quality 12 (2021). Their inpatient stays cost Medicare $2.01 billion and the vast majority of those admissions (73%) were to acute care hospitals. *Id.* at 2, 18.

78.     Such costs to patients and Medicare itself would rise exponentially if Vohra Wound Physicians can no longer service patients at their nursing home facilities. This will have a significant detrimental effort on Vohra Wound Physicians' patients, in addition to the public at large.

## CMS UNLAWFULLY RETALIATED AGAINST VOHRA

79.     CMS's suspension of Medicare payments was clearly unlawful because it was adopted in retaliation for Vohra's exercise of its First and Fifth Amendment rights to challenge the claims brought by the government in the FCA lawsuit.

80.     A constitutional retaliation claim has three elements: that the plaintiff: (1) engaged in activity protected under the Constitution; (2) suffered an adverse action by the defendant that would deter a person of ordinary fitness from engaging in the protected activity; and (3) there was a causal connection between the adverse action and the protected activity. *See Williams v. Radford*, 64 F.4th 1185, 1192 (11th Cir. 2023). Once this *prima facie* case is satisfied, the burden shifts to the government to prove that it "would have made the same decision based solely on unprotected activities." *Warren v. DeSantis*, 90 F.4th 1115, 1138 (11th Cir. 2024), *vacated as moot*, 125 F.4th 1361 (11th Cir. 2025); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977). The government will fail to carry this burden if the excuse it musters is merely pretext. *See, e.g.*, *Warren*, 90 F.4th at 1134 (requiring government to "*prove* that *legitimate* reasons" actually "motiv[ated] [its] decision" (emphasis added)).

81.     Filing the motion to dismiss was an exercise of Vohra's due process rights under the Fifth Amendment. The FCA lawsuit seeks to deprive Vohra of its property—by seeking significant damages and fines—and Vohra therefore has "a constitutional [due process] right to challenge" the FCA lawsuit and engaged in a protected activity when it moved to dismiss. *Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1326 (11th Cir. 2023) (finding due process right implicated where fine would be paid from "Zen Group's money"); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."). The government may not retaliate against a person for exercising its due process rights. *See Zen Grp.*, 80 F.4th at 1335 (Pryor, J., concurring) ("The opportunity to be heard means little if the government may, without consequence, punish persons for availing themselves of a hearing.").

82.     The filing of the motion to dismiss in the FCA lawsuit was also activity protected by the First Amendment's guarantee of the right to petition and right to free speech. *See Int'l Bhd. of Teamsters Loc. 947 v. Nat'l Lab. Rels. Bd.*, 66 F.4th 1294, 1306 (11th Cir. 2023) ("One can reasonably assume that the filing of a motion to compel arbitration will typically be protected as an exercise of the First Amendment right to petition."); *Green v. City of Montgomery*, 792 F. Supp. 1238, 1253 (M.D. Ala. 1992) ("The right to participate as a party to litigation … has traditionally been considered an aspect of the freedom to petition the government for a redress of grievances protected by the first amendment." (citing *Cal. Motor Transport v. Trucking Unltd.*, 404 U.S. 508, 510 (1972))). *See also Zen Grp.*, 80 F.4th at 1330-1331 (holding that the speech and petition clauses protected a motion filed in administrative litigation).

83.     Vohra's motion to dismiss is the speech of a private citizen on a matter of public concern, as the "content, form, and context" of the document show. *O'Laughlin v. Palm Beach Cty.*, 30 F.4th 1045, 1051 (11th Cir. 2022). The motion is a response to the FCA's complaint, and thus its content relates directly the complaint's factual allegations that the government has been defrauded of "millions of dollars." *Vohra* Compl. ¶ 15, ECF No. 1. Whether such a widespread fraud on the public fisc occurred is plainly a matter of public concern. *See, e.g.*, *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1990) ("Courts have frequently found that the public fisc is a matter of public concern."); *Lane v. Franks*, 573 U.S. 228, 241 (2014) ("[C]orruption in a public program and misuse of state funds … obviously involves a matter of significant public concern."); *cf. Barbuto v. Miami Herald Media Co.*, 2022 WL 123906, at *6 (S.D. Fla. 2022) ("It is obvious" that "healthcare fraud in South Florida" is "a matter of public concern" for purposes of state-law reporting privilege).

84.     The motion was also highly critical of the government's misguided FCA investigation, describing the investigation as "mining" Medicare claims and "reverse-engineer[ing] FCA liability," in a way that diverted public resources from pursuing potentially meritorious claims against others. Mot. to Dismiss at 1, *Vohra*, ECF No. 15. *Compare Zen Grp.*, 80 F.4th at 1330-1331 (motion's characterization of the agency's actions as "rudderless" and "ad hoc" sufficiently spoke on a matter of public concern because "the problems described in the … motion relate to the functioning of a public agency"). And the motion highlighted the public health implications of the government's complaint, noting that Vohra Wound Physicians' patients nationwide are "particularly prone to developing significant wounds that need to be treated by specialists" and its physicians must "provide services, at patients' bedsides, that cannot be provided in-house." Mot. to Dismiss at 1, *Vohra*, ECF No. 15.

85.     As for form and context, Vohra's speech occurred in a public court filing (*see Zen Grp.*, 80 F.4th at 1330; *Lane*, 573 U.S. at 241), and Vohra publicized its motion in a press release. *See* Vohra Wound Physicians Management, LLC, *Vohra Wound Physicians Files Motion to Dismiss Government Lawsuit*, PR Newswire (May 19, 2025). Vohra's speech is plainly protected.

86.     Next, Vohra suffered an adverse action by the government that would deter a person of ordinary firmness from engaging in the protected activity because Vohra is suffering severe financial harm—and being pushed to the edge of financial ruin—for refusing to settle the FCA lawsuit and exercising its constitutional rights to move to dismiss that action. *See Bennett v. Hendrix*, 423 F.3d 1247, 1255 (11th Cir. 2005), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) (showing that a financial injury as small as $35 can satisfy this element). In short, the loss of nearly all of a person's money and the threat of bankruptcy would clearly deter a person of ordinary firmness from engaging in constitutionally protected activity.

87.    Finally, the causal connection between the adverse action and Vohra's protected activity is clear from the timing of the suspension decision alone. *See, e.g., Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1405 (S.D. Fla. 2014) (Causation is shown by "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory act."). Here, the suspension followed hard on the heels of the Vohra's constitutionally protected conduct. Only two business days after Vohra's motion to dismiss, CMS suspended all its payments.

88.    The timing of the suspension is even more "unusually suggestive" because it starkly diverges with CMS's ordinary practice of initiating payment suspensions, if at all, during the investigation of a claim rather than after the filing of litigation. According to Vohra's retained expert Bradley Hart, it is virtually unprecedented for the government to do what it has done here: initiate a payment suspension *after* the filing of civil litigation, based on no new information. That CMS has done so in this case, mere days after Vohra filed its motion to dismiss, speaks of no explanation other than retaliation.

89.    Because the government long knew of the fraud allegations against Vohra, yet never acted on them, it cannot show that it would have made the same payment suspension decision absent retaliatory motive. Armed with all the same information, it made the opposite suspension decision—no suspension—*for years*, only to reverse course days after Vohra's motion to dismiss.

90.     It would thus make no difference if CMS had probable cause to make the suspension decision—a standard that does not apply in this case and which the government lacks in any event. Even possessing probable cause does not permit the government to retaliate over constitutionally protected conduct "when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019). As

just explained, CMS's treatment of Vohra—suspending its payments only after the filing of litigation and a responsive motion—is without any precedent in comparable circumstances.

### VOHRA'S CLAIMS ARE PROPERLY BEFORE THIS COURT

91.     This challenge to the suspension of Vohra's Medicare payments arises under the Medicare Act. *See* 42 U.S.C. § 405(h).

92.     Title 42 U.S.C. § 405(g) allows judicial review after a final decision of the HHS Secretary.

93.     In *Smith v. Berryhill*, 587 U.S. 471 (2019), the Supreme Court interpreted 42 U.S.C. § 405(g)—the statute authorizing judicial review of the HHS Secretary—as having two requirements.

94.     The first element is nonwaivable and requires the plaintiff to present their claim to the government.

95.     Vohra met this requirement when it filed its rebuttal statement. *See General Medicine, P.C. v. Secretary of HHS*, 2023 WL 6164556, at *7 (E.D. Mich. Sept. 21, 2023).

96.     The second requirement is waivable and requires that the administrative remedies prescribed by the HHS Secretary be exhausted. *Smith*, 587 U.S. at 487.

97.     The Eleventh Circuit considers three factors "to determine whether waiver is applicable: (1) are the issues entirely collateral to the claim for benefits; (2) would failure to waive cause irreparable injury; and (3) would exhaustion be futile." *Crayton v. Callahan*, 120 F.3d 1217, 1220 (11th Cir. 1997); *see also Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1296 n.5 (11th Cir. 2004). A showing of any of these circumstances can suffice to support waiver of exhaustion. *See, e.g.*, *Alpha Home Health Sols., LLC v. Sec'y of U.S. Dep't of Health & Hum.*

*Servs.*, 340 F. Supp. 3d 1291, 1300-1301 (M.D. Fla. 2018) (waiving exhaustion based on collateral nature of challenge).

98.     This approach stems from the Supreme Court's analysis in *Bowen v. City of New York*, 476 U.S. 467, 483 (1986), in which the Court "looked at several factors," with the ultimate goal of determining "whether application of the exhaustion doctrine was practical, and whether it was consistent with the requirement's underlying policies." *Crayton*, 120 F.3d at 1221-1222. These considerations each support waiver here.

99.     *First*, the constitutional retaliation claims are entirely collateral to the substance of CMS's suspension decision and, ultimately, to any overpayment determination by CMS.

100.    "For a claim to be collateral, it must not require the court to 'immerse itself' in the substance of the underlying Medicare claim or demand a 'factual determination' as to the application of the Medicare Act." *Fam. Rehab., Inc. v. Azar*, 886 F.3d 496, 501 (5th Cir. 2018). Rather, collateral challenges often target "fundamentally … a procedural irregularity and not of [the agency's] substantive" decision-making. *Bowen v. City of New York*, 476 U.S. 467, 477 (1986).

101.    Vohra's constitutional claims focus solely on whether CMS improperly retaliated against Vohra for exercising its constitutional rights by moving to dismiss the FCA Lawsuit. They center on the irregular procedure of the payment suspension—since it was out-of-step with the agency's usual timing for making suspensions and driven by retaliatory animus rather than a proper exercise of agency suspension—not the merits of suspension itself.

102.    These claims involve determining whether the plaintiff engaged in a protected activity; whether plaintiff suffered an adverse action that would deter others from engaging in the protected activity; and whether there is a causal connection between the adverse action and the

protected activity. *See DeMartini*, 942 F.3d at 1289.They thus do not require the court to "immerse itself in the substance of the underlying Medicare claim or demand a factual determination as to the application of the Medicare Act," and are appropriately considered collateral to the underlying Medicare-related FCA claims. *Fam. Rehab.*, 886 F.3d at 501 (internal quotation marks omitted) (finding a similar claim collateral because plaintiff "does not seek a determination that the recoupments are wrongful under the Medicare Act … and because it raises claims unrelated to the merits of the recoupment").

103.    *Second*, failing to waive administrative exhaustion of Vohra's constitutional retaliation claims would cause irreparable injury.

104.    CMS's unconstitutional payment suspension has dramatically reduced Vohra Wound Physicians' revenue, threatening to put the company out of business within months, and will impose significant life-threatening harm on hundreds of thousands of nursing home patients if Vohra Wound Physicians (as is likely) fails as a business before the protracted administrative proceedings are complete.

105.    These circumstances are more than enough to establish the level of irreparable injury required to waive administrative exhaustion. *See Ron Grp., LLC v. Azar*, 2021 WL 5576616, at *5 (M.D. Ala. Nov. 29, 2021) ("Economic losses may be sufficient to demonstrate irreparable injury where 'the loss threatens the very existence of the movant's business.'" (quoting *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014))); *Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 755 (N.D. Tex. 2019) (finding irreparable injury in Medicare context where plaintiff laid off employees, gross revenue decreased by over 60%, and company was at risk of bankruptcy); *Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Mathews*, 425 F. Supp. 5, 8 (S.D.

Fla. 1976) (finding 15% reduction in income sufficient for irreparable injury despite the lost income not being "catastrophic").

106.     Additionally, it is black-letter law that "an ongoing violation of the First Amendment constitutes an irreparable injury." *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017); *see also Elrod v. Burns*, 427 U.S. 347, 373-374 (1976). The same is true of the due process retaliation claim, as the harm suffered absent an injunction creates a comparable "'chilling effect' on protected … activity," the need for "deterrence" of which "has equal force in the due-process context." *Zen Grp.*, 80 F.4th at 1335 (Pryor, J., concurring).

107.     *Third*, any attempt to administratively exhaust Vohra's constitutional retaliation claims here would be futile.

108.     Because Vohra Wound Physicians' business is on track to collapse in a matter of months—portending serious harms not just to itself but also its vulnerable patients needing wound care—to require Vohra to await administrative exhaustion, which will likely be complete "only after these devastating events have already occurred[,] would be a futile, empty, hollow exercise." *GOS Operator*, 2012 WL 175056, at *5.

109.     Additionally, under Supreme Court precedent, administrative exhaustion is considered futile when the agency is "unable to consider whether to grant relief because it lacks institutional competence to resolve the particular type of issue presented." *McCarthy v. Madigan*, 503 U.S. 140, 147-1448 (1992). That is the precise situation here, where HHS adjudicators have no institutional competence to resolve constitutional retaliation claims. Indeed, the Supreme Court "has often observed that agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise." *Carr v. Saul*, 593 U.S. 83, 92 (2021). Like the structural constitutional challenges at

issue in *Carr*, the issue of whether suspending Vohra's Medicare payments was unconstitutional retaliation falls outside agency expertise.

110.    In other words, "no matter how much expertise could be 'brought to bear'" by HHS adjudicators on Medicare regulations, the agency does not have the expertise to adjudicate Vohra's retaliation claim. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 195 (2023); *see also Joseph Forrester Trucking v. Dir., Off. of Workers' Comp. Programs*, 987 F.3d 581, 591 (6th Cir. 2021) ("To be sure, raising a facial constitutional challenge outside the limited scope of an ALJ's adjudicative authority might well be futile.").

111.    In any event, providers need not exhaust administrative processes where that process "would not lead to a channeling of review through the agency, but would mean no review at all." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 17 (2000). This is essential to avoid the "serious constitutional question … [that] would arise if we construed § 1395ii to deny a judicial forum for constitutional claims." *Id.*; *see also Karnak Educ. Tr. v. Bowen*, 821 F.2d 1517, 1520 (11th Cir. 1987) (challenge to interim suspension; "Federal courts do, however, have jurisdiction to decide non-frivolous constitutional claims brought by Part B participants."). CMS regulations purport to deny review over the type of suspension issued here. *See* 42 C.F.R. § 405.375(c) ("A determination made under paragraph (a) of this section is not an initial determination and is not appealable."). Because failing to waive exhaustion would not "channel" review through the agency but instead deny review, Vohra's constitutional claims are properly before this court. *Shalala*, 529 U.S. at 17.

112.    Therefore, Vohra has satisfied the two elements in 42 U.S.C. § 405(g) and is properly before this court.

## CLAIMS FOR RELIEF

## COUNT I

**The Secretary's suspension of Vohra's Medicare payments violates Vohra's First Amendment right to be free from retaliation for invoking its freedom of speech and freedom to petition rights.**

**(42 U.S.C. §§ 405(g), 1395ii; 5 U.S.C. § 706(2)(B); U.S. Const. amend. I.)**

113.    Vohra incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

114.    Vohra engaged in activity protected under the First Amendment—freedom of speech and petition—when it filed its motion to dismiss in the FCA lawsuit.

115.    Vohra suffered an adverse action when CMS suspended its Medicare payments days later in a manner highly atypical to its usual payment suspension practices.

116.    This adverse action was severe enough that it would deter a person of ordinary firmness from engaging in constitutionally protected activity.

117.    There is a causal connection between the CMS payment suspension and Vohra's filing of its motion to dismiss.

118.    Vohra has a right to be free from retaliation for filing its motion to dismiss, challenging the sufficiency of the government's allegations of fraud. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech."); *see, e.g.*, *Williams v. Radford*, 64 F.4th 1185, 1192-1194 (11th Cir. 2023).

119.    CMS violated that right when it suspended Vohra's Medicare payments in retaliation for Vohra's filing of a motion to dismiss in the FCA lawsuit.

120.    The First Amendment "give[s] rise to [an] equitable cause[] of action." *Sierra Club v. Trump*, 963 F.3d 874, 888 (9th Cir. 2020) (citing *Trump v. Hawaii*, 585 U.S. 667, 698 (2018)),

*vacated on other grounds Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (mem.). *See also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Vohra asserts an equitable claim for injunctive relief arising under the First Amendment because defendants have unlawfully retaliated against Vohra in the exercise of its rights under the First Amendment of speech and petition.

121.    Additionally, or in the alternative, Vohra asserts a claim for relief under the Administrative Procedure Act (5 U.S.C. § 706), which authorizes courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right" (*id.* § 706(2)(A)-(B)). By retaliating against Vohra for the exercise of its First Amendment rights, defendants acted unlawfully and contrary to Vohra's constitutional right.

122.    Additionally, or in the alternative, Vohra asserts a claim for relief under 42 U.S.C. § 405(g), which, as incorporated by 42 U.S.C. § 1395ii, authorizes courts to review and "modif[y] or revers[e]" a decision by CMS. Because defendants unlawfully retaliated against Vohra for the exercise of its First Amendment rights, the suspension of Medicare payments should be reversed.

123.    If Vohra's Medicare payments are not restored, Vohra will suffer substantial and irreparable harm for which there is no adequate remedy at law.

## COUNT II

**The Secretary's suspension of Vohra's Medicare payments violates Vohra's Fifth Amendment right to be free from retaliation for invoking its due process rights.**

**(42 U.S.C. §§ 405(g), 1395ii; 5 U.S.C. § 706(2)(B); U.S. Const. amend. V.)**

124.    Vohra incorporates and re-alleges paragraphs 1 through 112 as though fully set forth herein.

125.    Vohra has a property interest protected by the Due Process Clause because it will have to pay the government money if it settles or is found liable in the FCA case. *Zen Grp.*, 80 F.4th at 1326.

126.    Vohra engaged in activity protected under the Due Process Clause when it filed its motion to dismiss in the FCA action.

127.    Vohra suffered an adverse action when CMS suspended its Medicare payments days later in a manner highly atypical to its usual payment suspension practices.

128.    This adverse action was severe enough that it would deter a person of ordinary firmness from engaging in constitutionally protected activity.

129.    There is a causal connection between the CMS payment suspension and Vohra's filing of its motion to dismiss.

130.    Vohra has a right to be free from retaliation for exercising its procedural due process rights under the Fifth Amendment. *See Zen Grp.*, 80 F.4th at 1335 (Pryor, J., concurring).

131.    CMS violated that right when it suspended Vohra's Medicare payments in retaliation of Vohra's filing of a motion to dismiss in the FCA lawsuit, combating the government allegations of fraud.

132.    "Certain provisions of the Constitution give rise to equitable cause[s] of action. (*Sierra Club*, 963 F.3d at 888), including the "Fifth Amendment guarantee[] of due process" (*United States v. Minor*, 228 F.3d 352, 356 (4th Cir. 2000)). *See also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Vohra asserts an equitable claim for injunctive relief arising under the Fifth Amendment Due Process Clause because defendants have unlawfully

retaliated against Vohra in the exercise of its rights under the Fifth Amendment to engage in judicial process prior to the deprivation of its property.

133.    Additionally, or in the alternative, Vohra asserts a claim for relief under the Administrative Procedure Act (5 U.S.C. § 706), which authorizes courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right" (*id.* § 706(2)(A)-(B)). By retaliating against Vohra for the exercise of its Fifth Amendment due process rights, defendants acted unlawfully and contrary to Vohra's constitutional right.

134.    Additionally, or in the alternative, Vohra asserts a claim for relief under 42 U.S.C. § 405(g), which, as incorporated by 42 U.S.C. § 1395ii, authorizes courts to review and "modif[y] or revers[e]" a decision by CMS. Because defendants unlawfully retaliated against Vohra for the exercise of its Fifth Amendment due process rights, the suspension of Medicare payments should be reversed.

135.    If Vohra's Medicare payments are not restored, Vohra will suffer substantial and irreparable harm for which there is no adequate remedy at law.

### COUNT III

### The Secretary's suspension of Vohra's
### Medicare payments is an *ultra vires* act.

### (*Ultra vires*)

136.    Vohra incorporates and re-alleges paragraphs 1 through 112 as though fully set forth herein.

137.    "In the agency context, an *ultra vires* act is one where the agency has exceeded its statutory or constitutional power to act." *D&G Holdings, LLC v. Sylvia Mathews Burwell*, 156 F. Supp. 3d 798, 816 (W.D. La. 2016) (citing *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290 (2013)).

138.     The relevant statute here only grants the Secretary the power to suspend payments in response to a credible allegation of fraud. *See* 42 U.S.C. § 1395y(o) ("The Secretary may suspend payments to a provider of services or supplier under this subchapter pending an investigation of a credible allegation of fraud against the provider of services or supplier, unless the Secretary determines there is good cause not to suspend such payments.").

139.     The Secretary therefore exceeded his statutory and constitutional power when he suspended Vohra's Medicare payments not based on credible allegations of fraud, but rather in retaliation for Vohra's exercise of its constitutional rights by moving to dismiss the FCA lawsuit.

140.     Because the Secretary exceeded his statutory and constitutional power, the suspension decision was *ultra vires*.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants in the claims set forth above and respectfully requests that this Court:

a.   Preliminarily and permanently enjoin CMS's Medicare payment suspensions as to Plaintiffs;

b.   Set aside CMS's suspension of Medicare payments as to Plaintiffs;

c.   Issue a declaratory judgment under 28 U.S.C. §§ 2201, 2202 stating that CMS's suspension of Medicare payments as to Plaintiffs was unlawful under each Count in this complaint; and

d.   Award Plaintiffs such further and additional relief as this Court deems just and proper.

Dated:  July 7, 2025

Respectfully submitted,

*By its attorneys,*

**MCDERMOTT WILL & EMERY LLP**

/s/ *Oliver Benton Curtis*
Oliver Benton Curtis, III (FBN 118156)
bcurtis@mwe.com
Leah Palmer (FBN 1050765)
lpalmer@mwe.com
McDermott Will & Emery LLP
333 SE 2nd Avenue
Suite 4500
Miami, FL 33131
(305) 358-3500

Paul W. Hughes (to file *pro hac vice*)
phughes@mwe.com
Sarah P. Hogarth (to file *pro hac vice*)
shogarth@mwe.com
Mary H. Schnoor (to file *pro hac vice*)
mschnoor@mwe.com
Emmett Witkovsky-Eldred (to file *pro hac vice*)
ewitkovsky-eldred@mwe.com
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

Mara Theophila (to file *pro hac vice*)
mtheophila@mwe.com
McDermott Will & Emery LLP
200 Clarendon Street
Floor 58
Boston, MA 02116
(617) 535-4107